UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DANIEL PEREA,

      Plaintiff,

vs.                                                  No. CV-06-764 WJ/RHS

SEARS, ROEBUCK AND CO., INC.,

      Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment. (Doc. 29). The Court, having fully considered the instant motion, Plaintiff's Response (Doc. 36), Defendant's Reply (Doc. 37), the relevant law, the November 7, 2007 oral arguments of counsel (Doc. 48), and otherwise being fully informed, finds that the motion shall be granted in part and denied in part.

As a preliminary matter, Defendant's instant Motion for Summary Judgment and Memorandum Brief in Support of the instant Motion both note that Plaintiff's counsel advised Defendant's counsel that the retaliatory discharge claim has been withdrawn. (Doc. 29, 32). Moreover, Defendant's Memorandum notes that "in reliance on [the withdrawal] Defendant does not address [retaliatory discharge] here." (Doc. 32). Plaintiff's Response to Defendant's Motion for Summary Judgment does not reference the retaliatory discharge claim originally lodged in Plaintiff's Complaint. (Doc. 1, 36). Thus, the Court finds that Plaintiff has withdrawn his retaliatory discharge claim, and this claim is no longer before the Court.

1

**BACKGROUND**

Plaintiff Daniel Perea worked for Defendant Sears, Roebuck, and Co. for 27 years at the Coronado Mall store in Albuquerque.  On December 17, 2004, Defendant terminated Plaintiff from his position as assistant store manager for operations.  Plaintiff filed the instant suit alleging that "the dispute in this case centers on Sears' transparent attempt to characterize a perceived job performance complaint as a criminally reprehensible infraction equivalent to stealing or robbing the company."  (Doc. 36).  Defendant contends that the termination of Plaintiff was the result of "an integrity violation consisting of his falsifying a required quarterly report regarding inventory."  (Doc. 32).  Moreover, Defendant asserts that Plaintiff "had been coached and warned by the then-store general manager . . . and the then-district operations manager . . . about the importance of accurately and truthfully completing these inventory protection reports."  (Doc. 32).

**Undisputed Facts**

Plaintiff Perea is a Hispanic male.  From approximately July 2002 until Javier Cardenas' retirement in May 2004, he was the store general manager for the Sears Coronado Mall store in Albuquerque.  Mr. Cardenas worked for Sears for 35 years before retiring in May 2004.  Kerry Knight was the Albuquerque Sears store general manager and Sharon Boehmer was the district operations manager at the time of Plaintiff's termination (Dec. 17, 2004).  Ms. Knight handled the termination of Plaintiff.  Ms. Knight obtained approval from Sears to terminate Plaintiff.  Ms. Boehmer was present at the time of Plaintiff's termination.  Plaintiff did not call the Sears ethics hotline to open an investigation concerning discrimination stemming from the actions of Ms. Knight and Ms. Boehmer.  Joseph Cordero, another Hispanic male, replaced Plaintiff at Sears. Plaintiff sought medical treatment for depression following his termination.

2

Defendant publishes written policies concerning discrimination and harassment and distributes these written policies to Sears employees.  Plaintiff not only read and understood these policies, he administered them as assistant store manager.  Further, Plaintiff read and used the "Sears Human Resources Guide for Managers" [hereinafter "Guide"] in connection with his service as assistant manager.  Inventory Protection Store Process Standards [hereinafter "IPSPS"] forms were required to be completed quarterly.

**STANDARD OF REVIEW**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party."  Id. (internal quotations omitted).  Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  Id. at 248.

**DISCUSSION**

The five summary judgment claims contained in Defendant's instant Motion are analyzed in this Memorandum Opinion and Order.  Undisputed facts are noted to the extent they provide the basis for the denial of a particular summary judgment claim.

**I.  Breach of Contract**

"Ordinarily, to be legally enforceable, a contract must be factually supported by an offer,

3

an acceptance, consideration, and mutual assent." <u>Hartbarger v. Frank Paxton Co.</u>, 115 N.M. 665, 669 (1993) (citations omitted). Indeed, the conduct of Plaintiff and Defendant indicates an offer of employment, acceptance, and consideration. That is, Plaintiff was offered and he accepted employment with Sears in 1977, and was offered and accepted the position of Regional Operations Manager (designated as an "assistant store manager" position according to the complaint) in 2002. In each instance, Plaintiff proceeded to carry out the specific tasks required of him in service of Sears, and the Defendant compensated him accordingly.

Despite this contractual arrangement, "[t]he general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." <u>Hartbarger</u>,115 N.M. at 668 (1993) (citing <u>Melnick v. State Farm Mut. Auto. Ins. Co.</u>, 106 N.M. 726, 730 (1988)). However, "New Mexico courts have recognized two additional exceptions to the general rule of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge." <u>Id.</u> (citation omitted).

### A. Express Contract

Plaintiff argues that "the uncontroverted evidence from Sears' own witness that Sears managers had to 'sign off' stating they had received the Guide could lead a reasonable factfinder to conclude the parties intended the Guide to constitute an express contract of employment." (Doc. 36). Plaintiff does not elaborate on this argument in his Response to Defendant's Motion for Summary Judgment. Confusingly, Plaintiff cites to <u>Kiedrowski v. Citizens Bank</u>, 119 N.M. 572 (Ct. App. 1995), a case where the New Mexico Supreme Court found a memorandum did not create a new express contract between the parties. Similar to <u>Kiedrowski</u>, in this case

4

"[t]here is no factual indication that the parties agreed to enter into a new or separate

employment contract . . . ." Id. at *13 (citing Trujillo v. Glen Falls Ins. Co., 88 N.M. 279, 280

(1975)).  Finally, "[w]hen the minds of the parties have not met on any part or provision of a

proposed contract, all of its portions are a nullity." Lamonica v. Bosenberg, 73 N.M. 452, 455

(1964).

Plaintiff did not offer any evidence that the minds of the parties met.  In fact, the Guide

which he signed explicitly says that employment at Sears remains at-will.  For these reasons the

Court shall grant Defendant's Motion for Summary Judgment on Plaintiff's express contract

claim.

### B.  Implied Contract

"Where the parties have not addressed the issue of termination, courts will supply a

default term permitting either party to terminate the relationship at any time, for any reason."

Mealand v. Eastern. N.M. Med. Ctr., 131 N.M. 65, 69 (Ct. App. 2001) (citations omitted).  This

presumption of at-will employment is rebuttable by "an implied contract term that restrict[s] the

employer's power to discharge. . . ." Hartbarger, 115 N.M. at 668 (citation omitted).  If an

employer's "representations are 'sufficiently explicit,' a jury may find that a contract is implied

in fact to 'restrict' the absolute power of the employer to discharge at will." Kiedrowski, 119

N.M. at *5 (quoting Hartbarger, 115 N.M. at 672).

"Under New Mexico law, whether an implied contract was created is generally a question

of fact." Sullivan v. America Online, Inc., 219 F.App'x. 720, 721 (10th Cir. 2007) (citing

Hartbarger, 115 N.M. at 669).  "A promise, or offer, that supports an implied contract might be

found in written representations such as an employee handbook, in oral representations, in the

conduct of the parties, or in a combination of representations and conduct." Hartbarger, 115

5

N.M. at 669 (citing <u>Newberry v. Allied Stores, Inc.</u>, 108 N.M. 424, 427 (1989) (noting that the totality of the parties' relationship, circumstances, and objectives are to be considered)). Since 1980, when the New Mexico Supreme Court recognized an implied employment contract in <u>Forrester v. Parker</u>, 93 N.M. 781, 782 (1980), the New Mexico Supreme Court has not required additional factual consideration to be shown. In <u>Forrester</u> a personnel policy guide that set out termination procedures gave rise to an implied employment contract. <u>Id.</u> Finally,

> [W]here there is proof of a promise sufficient to support an implied contract, the consideration sufficient to support the implied contract will be implied as a matter of law by the court whether the promise was part of the original employment agreement or was made later in modifying the employment relationship.
> . . . .
> When an employer offers to restrict its power to discharge, the employee's assent to the restriction need not be evinced by anything more than commencing or continuing employment. As a matter of public policy, we see no need for any further manifestation of assent. Once the employee has successfully shown that the employer has demonstrated an intent to restrict its power to discharge, absent evidence to the contrary, the court will imply in law that the requirement of mutual assent has been met. There need be no separate factual finding of mutual assent.

<u>Hartbarger</u>, 115 N.M. at 670-71.

Under New Mexico law, an implied contract in employment cases requires that the promise that allegedly alters the presumed at-will employment must be sufficiently explicit to produce "reasonable expectations of termination for good cause only." <u>Id.</u> at 672. If the case involves an alleged promise stemming from a personnel manual, New Mexico law requires the manual to control employment relationships to the extent that an employee could reasonably expect his employer to abide by its own procedures. <u>Newberry</u>, 108 N.M. at 427. Additionally, "if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it. Having announced a policy, the employer may not treat it as

illusory." <u>Lukoski v. Sandia Indian Management Co.</u>, 106 N.M. 664, 667 (1988) (quoting

<u>Leikvold v. Valley View Community Hosp.</u>, 141 Ariz. 544, 548 (1984)).

**Factual Analysis**

The Court finds that a reasonable juror could deduce that an implied contract resulted

from the Guide and company practice.  The Court must consider the totality of the relationship

between Plaintiff and Defendant when deciding whether an implied contract could have been

formed.  Defendant Sears required all the managers to "sign off" that they had received and fully

reviewed the Guide.  Cardenas' affidavit supports Plaintiff's contention that Sears' managers

relied on the Guide to discipline employees.  Cardenas affidavit states:

> Sears had clear policies and procedures regarding how we disciplined and/or
> terminated Sears employees for performance issues.  That discipline process was
> called the Performance Plan for Improvement, or 'PPI.'
>     . . . .
> The PPI process provided Sears managers with clear, consistent direction
> about how to handle employees' performance issues, and it provided us with a
> training tool to help employees improve their performance to become more valuable
> associates. . . .  Employees were entitled to rely on the PPI process and knew what
> to expect from it.
>     . . . .
> In my tenure at Sears, I had to terminate employees for what were known as
> "integrity" violations, otherwise known as "documented dishonesty or willful
> misconduct.["]
>     . . . .
> It is not an integrity violation to fill in the [IPSPS] checklists improperly.
> This would be a performance issue, appropriate for a PPI.

(Doc. 36-3).

Viewing the evidence in the light most favorable to the Plaintiff, it appears that the use of

and interpretation of the Guide coupled with company practice during Plaintiff's lengthy career

at Sears were sufficiently explicit to create a reasonable expectation that Plaintiff would not be

fired for mistakenly filling out the IPSPS checklists.  Plaintiff testified in his deposition that he

7

had previously filled out the IPSPS checklists identically "ten or 11" times.  (Doc. 36-4).

Further, he asserts that he was never notified prior to his termination that his completion of the

checklists were inadequate, or were evidence of an integrity violation. Cardenas' affidavit

supports Plaintiff's contention that his firing departed from the longstanding practice within the

Albuquerque Coronado Mall Sears store.

The Defendant argues that the Guide's disclaimer of "at-will" employment necessitates

an interpretation of the Guide as non-contractual.  However, when the longstanding discipline

and performance approaches articulated in the Guide coupled with the practice of Sears

managers remains as consistent as Plaintiff's evidence suggests, a rational juror could find the

existence of an implied contract.  Ultimately, this is a question of fact and the Court shall deny

Defendant's Motion for Summary Judgment on Plaintiff's implied contract claim.

## II.  Racial Discrimination in Violation of the New Mexico Human Rights Act

Defendant, in its Memorandum Brief in Support of Summary Judgment, notes that "the

New Mexico courts look to federal civil rights law under Title VII for guidance in analyzing

claims under the Act."  (Doc. 32) (citing Gonzales v. N.M. Dept. Of Health, 129 N.M. 586, 593

(2000)).  Defendant further states, "[t]he analysis and burden-shifting process outlined in the

following section regarding the Title VII claim is followed by the state courts." Id. (citation

omitted).  Finally, Defendant asserts that both Plaintiff's New Mexico Human Rights Act

(NMHRA) and Title VII claims fail for the same reason.  Id.

Plaintiff, in its Response to Defendant's Motion for Summary Judgment, states that "[f]or

the purposes of this motion, Plaintiff will analyze his state law claims following federal law in

accordance with Gonzales v. N.M. Dept. Of health, 2000-NMSC-029, 129 N.M. 586, 11 P.3d

550 [2000]."  (Doc. 36).

8

In relevant parts, <u>Gonzales</u> held:

> In interpreting our state Human Rights Act, we have previously indicated that it is appropriate to rely upon federal civil rights adjudication for guidance in analyzing a claim under the Act, with the following reservation:
>
>> Our reliance on the methodology developed in the federal court, however, should not be interpreted as an indication that we have adopted federal law as our own. Our analysis of this claim is based on New Mexico statute and our interpretation of our legislature's intent, and, by this opinion, we are not binding New Mexico law to interpretations made by the federal courts of the federal statute.
>
> <u>Smith v. Cox</u>, 109 N.M. 514, 517 (1990).
>
> The Methodology referred to in <u>Smith</u> is the analytical framework articulated in <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792, 802-05, 36 L.Ed.2d 668, 93 S. Ct. 1817 (1973), for assessing employment discrimination claims."

<u>Gonzales</u>, 129 N.M. at 593. Based on the <u>Gonzales</u> opinion, the Court analyzes whether Plaintiff's NMHRA claims survive Defendant's Motion for Summary Judgment under the <u>McDonnell Douglas</u> burden shifting formula discussed in section III below.

## III. Racial Discrimination in Violation of Title VII

When a Title VII claim of discrimination relies on indirect or circumstantial evidence of discrimination, the Court reviews the claim under the <u>McDonnell Douglas</u> burden shifting formula. First, the plaintiff must set forth a prima facie case of retaliation. Then, the defendant is offered the opportunity to show a legitimate non-discriminatory reason for its adverse actions. Finally, if the defendant does so, the plaintiff must demonstrate that defendant's proffered reasons were the pretext for retaliation.

### First Prong: Prima Facie Case

The "prima facie case serves [to] eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejections." <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S.

248, 253-54 (1981).  Moreover, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1227 (2000) (quoting Burdine, 450 U.S. at 253).  Under Perry v. Woodward, 199 F.3d 1126 (10th Cir. 1999), in order for a plaintiff to make out a prima facie case of discriminatory discharge he "need only show that:  (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge."  Kendrick, 220 F.3d at 1229 (citing Perry, 199 F.3d at 1138).

Plaintiff easily sets forth a prima facie case of retaliation.  First, it is undisputed that Plaintiff belongs to a protected class–he is Hispanic.  Second, Plaintiff was certainly qualified for the job–he was a 27-year employee of Sears and had worked as the operations manager since February of 2002.  Third, Plaintiff was discharged despite his qualifications.  Finally, Plaintiff's job was not eliminated; rather, Joseph Cordero replaced Plaintiff.

### Second Prong:  Legitimate Non-Discriminatory Reason for Adverse Action

The second prong of the McDonnell Douglas burden shifting formula requires a defendant give a facially non-discriminatory reason for firing Plaintiff Perea.  Defendant, in its Memorandum Brief in Support of Summary Judgment, asserts that Ms. Knight terminated Perea for an integrity violation after warning him about the seriousness of "falsifying of the quarterly inventory report."  (Doc. 32).  This satisfies the second prong of the McDonnell Douglas burden shifting formula.

### Third Prong:  Pretext

The third prong of the McDonnell Douglas burden shifting formula requires a plaintiff demonstrate that defendant's proffered reasons were the pretext for retaliation.  "To show that

the defendant's proffered race-neutral reasons were actually a pretext for discrimination, this

Court has held that the plaintiff must demonstrate that the defendant's 'proffered [race-neutral]

reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could

conclude the reasons were unworthy of belief.'"  Young v. Dillon Cos., 468 F.3d 1243, 1250

(10th Cir. 2006) (quoting Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004)).

> The Tenth Circuit clarified the common methods of showing pretext in Kendrick:

> A plaintiff typically makes a showing of pretext in one of three ways:  (1) with evidence that the defendant's stated reason for the adverse employment action was false . . . ;(2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . . ;(3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.  A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly situated employees who violated work rules of comparable seriousness.

Kendrick, 220 F.3d at 1230 (citations omitted).

> Moreover, the Tenth Circuit articulated the role of a trial court during summary judgment

proceedings in Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir.1995):

> It is not the purpose of a motion for summary judgment to force the judge to conduct a "mini trial" to determine the defendant's true state of mind.  So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial.  Judgments about intent are best left for trial and are within the province of the jury.

Id. (citations omitted).

> Finally, "the evidence establishing the prima facie case, along with the reasonable

inferences drawn therefrom, coupled with a disbelief of the employer's explanation, can be

sufficient to make" a finding of pretext.  Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111

(10th Cir. 2005) (citations omitted).

## Factual Analysis

After reviewing all the summary judgment pleadings, including exhibits, the Court finds that a rational fact-finder could reasonably infer that Defendant's stated reasons for termination, an integrity violation, are simply pretextual.  Defendant argues that "[e]ven if Plaintiff's allegations are accepted as true at this point in the proceedings, he still has not demonstrated with facts any illegal discrimination against him because he is Hispanic."  (Doc. 32).  Defendant's position simply ignores the standard for granting summary judgment.

From Plaintiff's prima facie case we learn that he is a Hispanic with a lengthy record (27 years) of successful employment at Sears.  Moreover, Plaintiff served as assistant manager of operations from February of 2002 until his termination.  The affidavit of Mr. Cardenas bolsters Plaintiff's contention of pretext.  (Doc. 36-3).  Cardenas worked for Sears for 35 years before retiring in May 2004.  From approximately July 2002 until his May 2004 retirement, Cardenas was the store general manager of the Coronado Mall Sears store in Albuquerque.  Plaintiff served under Cardenas as assistant store manager for operations during that period.  Cardenas would have been in charge of terminating Plaintiff if needed during this time.  Cardenas' affidavit states:

> In my tenure at Sears, I had to terminate employees for what were known as "integrity" violations, otherwise known as "documented dishonesty or willful misconduct.["] . . .  Integrity violations were very different from performance issues.  Performance issues would always be addressed through the PPI disciplinary training process, while integrity violations were unrelated to an employee's work performance.
>       . . . .
> In my experience the checklists [plaintiff is alleged to have falsified] were an ongoing and collaborative process.  That collaboration would involve the store general manager, and the district operations manager while he or she was visiting the store. . . .  It is not an integrity violation to fill in the checklists improperly.  This would be a performance issue, appropriate for a PPI.

(Doc. 36-3).

Referring to Cardenas' affidavit, Plaintiff, in his Response to Defendant's Motion for Summary Judgment, argues that, "[s]uch evidence of Defendant[] acting directly contrary to its own written and unwritten policies and company standards is sufficient by itself to establish pretext." (Doc. 36). In <u>Kendrick</u> the Tenth Circuit mentioned that a plaintiff typically makes a showing of pretext with evidence the defendant acted contrary to written policy, unwritten policy or company practice. It seems clear that the unwritten company policy and company practice of Sears differed from the manner in which Plaintiff was allegedly disciplined and eventually terminated. Whether or not the written company policy in the Guide was correctly followed is an issue of material fact for trial.

Plaintiff also argues that "[a] factfinder could easily conclude that Sears' assertions that Plaintiff had been 'coached' (a fact which Plaintiff denies having occurred) are in fact a convenient, retrospective justification for a pretextual firing." (Doc. 36). In <u>Kendrick</u>, the Tenth Circuit also noted that a plaintiff commonly makes a showing of pretext when offering evidence that the defendant's proffered reasons for termination are false. In this case, the veracity of the proffered reasons for termination are very much genuine issues of material fact. Plaintiff disputes Defendant's assertion that Sears management warned Plaintiff he was incorrectly filling out the IPSPS checklists. Additionally, Plaintiff disputes Defendant's assertion that filling out the IPSPS checklists improperly constitutes an integrity violation. Finally, Plaintiff alleges that he completed the IPSPS checklists in an identical manner "10 or 11 times in the nearly three years he was store operations manager" and was never informed of any impropriety regarding these actions. (Doc. 36). Although a close call, the incongruence of Defendant's alleged reasons for termination compared with Plaintiff's assertions provide enough evidence that a rational fact-

finder could find pretext under a false reason analysis.

Plaintiff certainly passes the pretext hurdle with evidence tending to show Defendant acted contrary to longstanding unwritten policy and company practice. However, Plaintiff must prove much more than this to succeed at trial on the issue of discriminatory discharge. While Plaintiff may have difficulty prevailing at trial, he has presented sufficient evidence to allow his racial discrimination claims (NMHRA and Title VII) to survive summary judgment. Accordingly, the Court shall deny Defendant's Motion for Summary Judgment on Plaintiff's NMHRA and Title VII claims.

## IV.  Violations of the Federal Family Medical Leave Act (FMLA)

Plaintiff argues that Defendant terminated him without providing him the leave he was entitled to under the FMLA. (Doc. 1)  The FMLA provides in relevant part:

> An eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
> . . . .
>      (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

29 U.S.C. § 2612(a)(1)(C).

An "eligible employee" "means an employee who has been employed--(i) for at least 12 months by the employer with respect to whom leave is requested . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." Id. at § 2611(2)(A). "The term 'employer'--(i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[.]" Id. at § 2612(4)(A). "The term 'spouse' means a husband or wife, as the case may be." Id. at § 2612(13).  In this case there is no dispute that Plaintiff qualifies as an "eligible employee," Defendant qualifies as

an "employer," and Plaintiff's wife qualifies as a "spouse."

As a preliminary matter, Plaintiff's Complaint does not raise a claim that Defendant retaliated against Plaintiff for either taking, or attempting to take FMLA leave.  (Doc. 1). Moreover, Defendant's Memorandum Brief in Support of Summary Judgment (Doc. 32), Plaintiff's Response (Doc. 36), and Defendant's Reply (Doc. 37) also do not specifically address alleged FMLA violations under a retaliation theory.  Nevertheless, both parties debated such issues at the November 7, 2007 oral arguments concerning the instant motion.  (Doc. 48). Because of the content of the original Complaint and the lack of briefing concerning alleged retaliatory FMLA violations, the Court withholds judgment on this specific issue.

Plaintiff's Complaint asserts that "Defendant Sears unlawfully and willfully interfered with and restrained Plaintiff's rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(1)." (Doc. 1).  "To establish an interference claim, [Plaintiff] must show:  '(1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights.'"  Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007) (quoting Jones v. Denver Pub. Sch., 427 F.3d 1315, 1319 (10th Cir. 2005)).

"The FMLA, however, does not require a covered employee to specifically ask for FMLA benefits.  An employee need not expressly assert rights under the FMLA or even mention the FMLA. . . .  If the employer is on notice that the employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply."  Tate v. Farmland Indus., Inc., 268 F.3d 989, 997 (10th Cir. 2001) (citations omitted).

Under an interference theory "a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent."  Metzler v. Fed. Home Loan Bank of Topeka, 464

15

F.3d 1164, 1180 (10th Cir. 2006) (citing <u>Bones v. Honeywell Int'l, Inc.</u>, 366 F.3d 869, 877 (10th

Cir. 2004) (citing <u>Smith v. Diffee Ford-Lincoln-Mercury, Inc.</u>, 298 F.3d 955, 960 (10th Cir.

2002))).  Further, "the *McDonnell Douglas* burden-shifting analysis does *not* apply to

interference claims . . . ." <u>Id.</u> (citing <u>Smith</u> 298 F.3d at 963).

Despite the inclusive standard articulated in <u>Metzler</u>, "an employee may be dismissed,

preventing her from exercising her statutory right to FMLA leave [or reinstatement after leave]

 . . . if the dismissal would have occurred regardless of the employee's request for or taking of

FMLA leave." <u>Smith</u>, 298 F.3d at 961 (citation omitted).  Additionally, the burden to

demonstrate that "an employee, laid off during FMLA leave, would have been dismissed

regardless of the employee's request for, or taking of, FMLA leave" is on the defendant.  <u>Id.</u> at

963.

### First Prong:  FMLA Entitlement

First, the Court must analyze whether the FMLA entitled Plaintiff Perea to leave due to

the potential recurrence of his wife's cancer.  A "serious health condition" includes "an illness,

injury, impairment, or physical or mental condition that involves . . . continuing treatment by a

health care provider." 29 U.S.C § 2611(11)(B).  Plaintiff asserts that not only "was it common

knowledge throughout the store that Mr. Perea's wife had previously undergone treatment for

cancer," but that "Mr. Perea notified Ms. Knight on November 24, 2004, that recent blood tests

suggested his wife's cancer may have returned" and that "Mr. Perea connected his wife's

possible recurrence of cancer with his desire to 'step down' to a lighter position 'to spend more

time at home with my family based on the personal issues that were going on at home with my

wife.'" (Doc. 36) (citations omitted).  Clearly, cancer constitutes a serious health condition under

the FMLA.  Moreover, Plaintiff's wife's potential recurrence of cancer also constitutes a

16

"physical . . . condition that involves . . . continuing treatment by a health care provider."

Defendant, in its Memorandum Brief in Support of Summary Judgment, argues that "Ms. Knight testified she knew of no need for any such leave to be taken by Plaintiff, and that he never made a request for leave . . . .  At the time the employment termination took place, [Plaintiff] did not even know if his wife actually was having a recurrence of her medical condition, let alone whether her situation might have met the FMLA requirements for job-protected leave." (Doc. 32).  This argument misses the mark.  In Ms. Knight's deposition she testifies that:  (1) she knew Plaintiff's wife had cancer before Ms. Knight arrived at the Coronado Mall Sears store; (2) that if an employee was concerned cancer had returned to a spouse such an employee would probably be eligible to take time off and help; but (3) that she did not know or suspect in any way that Plaintiff was concerned that his wife's cancer may be returning.  (Doc. 32-6).  This last point directly contradicts Plaintiff's deposition testimony that on November 24, 2004, "I explained to Kerry Knight . . . that my wife has a history of cancer and she has had previous operations to treat her cancer and she goes every year for checkups to follow up on the blood tests and so forth, and that she was indicating to me that . . . there might be possibilities of the cancer coming back." (Doc. 36-4).  Further, Plaintiff testified that he told Ms. Knight that the possibility of the recurrence of his wife's cancer was the reason he wanted to "step down" to a lesser position with less time requirements and responsibilities.  Id.

Viewing the facts in the light most favorable to the non-movant, the Court finds that Ms. Knight was on notice that Plaintiff qualified for FMLA benefits, and thus Defendant had a responsibility to notify Plaintiff of this possibility.  Nevertheless, Defendant did not notify Plaintiff that he may qualify for FMLA leave.  Defendant, in its Reply Brief, erroneously argues that Plaintiff "obviously knew of his leave rights as they were spelled out in the same Guide

17

which he asserts he relied on for other purposes." (Doc. 37). Conversely, the Tenth Circuit has clearly stated a plaintiff does not lose his entitlement to FMLA leave because he did not expressly assert rights under the FMLA. Tate, 268 F.3d at 997. Thus, Plaintiff has made out the first prong of a prima facie case of interference with his substantive FMLA rights.

### Second Prong:  Interference with Substantive FMLA Right

The second prong of the prima facie case requires the Court to find that some adverse action by the defendant-employer interfered with the plaintiff's right to take FMLA leave. Plaintiff Perea contends Defendant interfered with his FMLA substantive rights by wrongfully terminating his employment for an alleged integrity violation. Viewing the facts in the light most favorable to the non-movant the Court finds that: (1) Plaintiff was entitled to FMLA leave; (2) Plaintiff notified Defendant about the potential recurrence of his wife's cancer; (3) Defendant ignored their duty to inform Plaintiff he may qualify for FMLA leave. Finally, by terminating Perea's employment, Sears interfered with his right to take up to twelve weeks of FMLA leave, thereby establishing the second element of Perea's prima facie FMLA interference claim.

### Third Prong:  Causal Connection

Finally, a plaintiff establishes the essential third prong of the prima facie FMLA interference case when he makes a showing of a causal connection between his termination and his exercise of FMLA rights. The Court must determine whether, viewing the record in the light most favorable to Perea, a genuine issue of material fact exists as to whether "the employer's action was related to the exercise or attempted exercise of [Perea's] FMLA rights." Jones, 427 F.3d at 1319. "Once a plaintiff has proved that [his] employer has interfered with [his] right to take FMLA leave, the employer bears 'the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of,

18

FMLA leave.'" Campbell, 478 F.3d at 1289 (quoting Smith, 298 F.3d at 963).

Defendant, in its Reply Brief, argues that "[e]ven if there had been any pending right to or request for FMLA leave at the time his employment was terminated, Plaintiff would not have been sheltered from the obligation to comply with employment policies." (Doc. 37) (citing Bones, 366 F.3d at 878). In Bones, the Tenth Circuit found that "[i]f dismissal would have occurred regardless of the request for an FMLA leave, however, an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave. . . . A reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory." Bones, 366 F.3d at 877 (citations omitted).

Defendant's reliance on Bones remains unpersuasive because this case is easily distinguishable. The Tenth Circuit described the fact situation in Bones as follows:

> [Defendant] specifically testified that he dismissed Bones because of her failure to comply with [Defendant's] absence policy, and would have terminated her regardless of her request for a medical leave. Bones proffers no evidence, aside from her own speculations, that contradict [Defendant's] testimony. The record shows that Bones had a history of tardiness and non-compliance with [Defendant's] absence policy. Bones had previously been given warnings that her failure to notify her supervisor of her absences would lead to her termination. . . .
>     Furthermore, it is uncontroverted that Bones did not comply with [Defendant's] absence policy on the dates for which she was terminated. . . . Bones was terminated because she did not comply with Honeywell's absence policy; she would have been terminated for doing so irrespective of whether or not these absences were related to a requested medical leave.

Bones, 366 F.3d at 878 (citation omitted).

Defendant asserts that Perea's potential FMLA substantive rights do not shelter him from avoiding the consequences of an integrity violation. (Doc. 37). Moreover, Defendant argues "the affidavit of a former store manager as to how he might have handled a situation like that which Plaintiff claims existed should be disregarded as speculative and immaterial." Id. In

Bones it was undisputed that the employer had a legitimate reason to terminate Bones. Specifically, in Bones, the idle speculation of the plaintiff did not provide a reasonable juror with an opportunity to find that termination was the result of her request for FMLA leave.

Plaintiff Perea's situation is much different than the situation in Bones.  In the instant case, it remains highly contested whether Defendant Sears had a legitimate reason to terminate Perea.  Numerous genuine issues of material fact remain:  (1) whether the Guide and company practice sufficiently establish an implied contract Sears may have breached; (2) whether Defendant Sears held a discriminatory motivation in part when terminating Plaintiff; (3) whether the allegedly falsified IPSPS checklist constituted an integrity violation; (4) whether Defendant notified Plaintiff of the need to amend the IPSPS checklist procedures before termination. Plaintiff has proffered the Guide, the deposition of Plaintiff Perea and the affidavit of Mr. Cardenas to produce the material issues of genuine fact that now confront the Court.

Finally, a reasonable juror could find that Perea's termination was related to a substantive right to FMLA leave.  Plaintiff, in his Response to Defendant's Motion for Summary Judgment, supports this inference by pointing to:  (1) the widespread knowledge throughout the Sears store that Plaintiff's wife previously underwent treatment for cancer; (2) Ms. Knight's knowledge that Plaintiff's wife previously underwent treatment for cancer; (3) Plaintiff's alleged notification of Ms. Knight on November 24, 2004, that recent blood tests suggested his wife's cancer had returned; (4) Mr. Perea's alleged notification of Ms. Knight that he wanted to "step down" because of the possible reoccurrence; (5) Ms. Knight's alleged disregard or failure to follow-up on Plaintiff's requests; (6) denial of Plaintiff's request to step down despite alleged knowledge of the potential recurrence of Plaintiff's wife's cancer.  (Doc. 36).  For these reasons, viewing the evidence in the light most favorable to the non-movant, a reasonable juror could deduce that

20

Plaintiff's termination was related to a substantive right to FMLA leave.  Thus, the Court shall

deny Defendant's Motion for Summary Judgment on Plaintiff's FMLA claim.

### V.  Intentional Infliction of Emotional Distress

In analyzing the tort of intentional infliction of emotional distress, New Mexico courts

have adopted the approach used in the *Restatement (Second) of Torts § 46* (1965).  Trujillo v.

Northern Rio Arriba Elec. Cooperative Inc., 131 N.M. 607, 616 (2001) (citing generally Padwa

v. Hadley, 127 N.M. 416 (1999)).  A plaintiff must prove four elements to establish a claim of

intentional infliction of emotional distress:  "(1) the conduct in question was extreme and

outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the

plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal

connection between the defendant's conduct and the claimant's mental distress."  Hakkila v.

Hakkila, 112 N.M. 172, 182 (Ct. App. 1991).  "The Restatement defines extreme and outrageous

conduct as that which is 'so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized community.'" Trujillo, 131 N.M. at 616 (quoting *Restatement (Second) of Torts § 46*

*cmt. d)*.

Initially, the trial court must find as a matter of law that the alleged conduct "reasonably

may be regarded as so extreme and outrageous that it will permit recovery under the tort of

intentional infliction of emotional distress."  Padwa, 127 N.M. at 419.  "When reasonable

persons may differ on that question, it is for the jury to decide, subject to the oversight of the

court."  Id. (relying upon *Restatement (Second) of Torts § 46 cmt. h)*.  "Being fired is a common

occurrence that rarely rises to the level of being 'beyond all possible bounds of decency' and

'utterly intolerable in a civilized community.'" Trujillo 131 N.M. at 617.

In addition to reviewing the conduct of the alleged tortfeasor, the trial court must also determine whether the plaintiff actually experienced severe emotional distress.  In this context, severe emotional distress means that "'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances.'"  Jaynes v. Strong-Thorne Mortuary, Inc., 124 N.M. 613, 618 (1997) (quoting Folz v. State, 110 N.M. 457, 469 (1990)).  Plaintiff's distress must be "so severe that no reasonable [person] could be expected to endure it."  *Restatement (Second) of Torts § 46 cmt. j.*

**Factual Analysis**

In this case, a reasonable juror could neither find that Defendant's conduct qualifies as extreme and outrageous, nor that Plaintiff actually experienced severe emotional distress.  The failure of these two elements of the tort defeats the claim.  Plaintiff, in his Response brief, argues:

> Plaintiff devoted 27 years of his life to Sears . . . .  Plaintiff in this case was called 'dishonest' and a 'liar' to his face, told to pack his things, and shoved out the door. Sears knowingly stripped Plaintiff of health benefits, which Sears knew Plaintiff was relying on to finance his wife's scheduled cancer testing and treatment for the recurrence of her cancer.  The record at this stage is replete with evidence which, viewed in the light most favorable to Plaintiff, demonstrates that two Sears managers inflicted humiliation, disgrace, economic hardship and despair no reasonable person should be expected to tolerate.

(Doc. 36).

Based on the record, the Court finds the conduct of Defendant was not extreme and outrageous, and certainly was not "beyond all possible bounds of decency" and "utterly intolerable in a civilized community."  Being called "dishonest" and a "liar" does not satisfy the high burden necessary for this tort.  No evidence on the record shows that Plaintiff was physically shoved.  Employees typically lose their health benefits when they are fired for cause.

Although the firing may have "inflicted humiliation, disgrace, economic hardship and despair," the specific unpleasant experiences associated with Perea's firing are within the bounds of societal decency and necessarily tolerable in a civilized society.

In regards to Plaintiff's alleged emotional distress, Plaintiff contends:

> Mr. Perea had no history of depression prior to his termination . . . .  The medical notes document both his extraordinary suffering . . . –including loss of appetite, weight loss, tearfulness, depression, decreased concentration, insomnia, ruminating thoughts, and possible suicidal ideation . . . .   Plaintiff in this case suffered a shocking degree of anguish and despair–for many months following his termination–along with humiliation he feels even to this day that this dignified man's name is permanently besmirched by the label "dishonest."

The record does not back up Plaintiff's claims.  Perea only met with a doctor once.  (Doc. 36-7).  At this meeting the doctor noted that Perea was experiencing:  (1) loss of appetite and weight loss; (2) depression; (3) loss of concentration; and (4) insomnia from ruminating thoughts.  Further, the Doctor noted that Perea was tearful and appeared depressed.  The visit to the doctor occurred four days after Perea's termination.  Plaintiff was prescribed Lexapro for these symptoms; however, in Perea's deposition he was unable to recall how often or for how long he took the drug.  Plaintiff offers no other medical evidence of Perea's severe emotional distress.  Additionally, Plaintiff's supplemental October 18, 2007 deposition of Todd Stockton, Perea's pastor at Hope Evangelical Free Church, does not persuade the Court that Plaintiff experienced the level of severe emotional distress required to maintain a claim for intentional infliction of emotional distress.  (Doc. 47).  Rather, the Court finds that not only could "a reasonable person, normally constituted . . .cope adequately with the mental distress engendered by the circumstances," but that it appears that Plaintiff Perea coped adequately with the circumstances after the initial hardship of being fired from a job he held for 27 years.  Quite simply, a reasonable person should be expected to endure the distress Plaintiff experienced.

23

Accordingly, the Court shall grant Defendant's Motion for Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment shall be granted in part and denied in part.  Specifically, Defendant's Motion for Summary Judgment shall be granted on Plaintiff's Express Contract and Intentional Infliction of Emotional Distress claims.  Moreover, Defendant's motion for Summary Judgment shall be denied on the remaining claims.

UNITED STATES DISTRICT JUDGE